# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 13, 2018

Lyle W. Cayce
Clerk

No. 15-20008

GE BETZ, INC., doing business as GE Water & Process Technologies,

Plaintiff–Appellant,

v.

MICHELLE MOFFITT-JOHNSTON; AMSPEC SERVICES, L.L.C.,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, OWEN, and ELROD, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

GE Betz, doing business as GE Water and Process Technologies (GE), appeals from the district court's partial grant of summary judgment and award of attorneys' fees in favor of its former employee Michelle Moffitt-Johnston and AmSpec Services, L.L.C. (AmSpec). We affirm the district court's judgment in part but vacate the award of attorneys' fees.

## I

In 2009, after over a decade working for GE and its predecessor, Moffitt-Johnston became the first head of GE's distressed fuels team, which performs "cargo treatments" for other companies. The cargo treatment process

No. 15-20008

involves adding chemicals to fuel before export to comply with another country's safety, environmental, or regulatory standards.

While employed by GE, Moffitt-Johnston executed an agreement governing the rights and obligations of GE and Moffitt-Johnston in the event the employment relationship ended. Among other provisions, the agreement contained a clause prohibiting Moffitt-Johnston from soliciting GE's "customers" or "prospective customers" for 18 months following her termination or resignation. The agreement defined "customer" as any current GE customer with whom Moffitt-Johnston had contact or about whom she learned confidential information during the 18 months preceding her departure, and defined "prospective customer" as any entity whose business Moffitt-Johnston had taken certain steps to solicit. Accordingly, the non-solicitation clause was limited to customers and prospective customers of GE with whom Moffitt-Johnston actually worked during her employment with GE. On September 19, 2012, Moffitt-Johnston informed GE that she was resigning. She agreed to, and did, stay on for approximately one month.

At some point in late 2011 or early 2012, AmSpec decided to enter the cargo treatment industry. AmSpec had previously served as a third party inspector for some of GE's cargo treatments. Shortly after Moffitt-Johnston informed GE that she was resigning, she spoke with AmSpec about joining the company to operate its new additives division, which would compete with GE in providing cargo treatments. By October 11, 2012, Moffitt-Johnston—while still working for GE—accepted an offer to lead AmSpec's new division. Although she advised GE that she would be joining AmSpec, Moffitt-Johnston did not inform GE, and in fact repeatedly denied, that she would be competing with GE in her new role. Had she revealed that she would be competing with GE, GE's standard practice would have been to deny Moffitt-Johnston access

2

to GE's data network and her employment likely would have been terminated immediately.

Moffitt-Johnston's computer activity in the weeks leading up to her departure was highly suspicious. GE installs monitoring software on the computers of all GE employees, which captures and logs certain actions taken, including emails sent and files copied to external hard drives. According to a report generated by the software on Moffitt-Johnston's computer (the DLP report), on September 24, 2012, days after she announced her resignation, someone using Moffitt-Johnston's computer downloaded over 27,000 files to an external hard drive. The circumstances of this download are disputed; Moffitt-Johnston offered evidence that the download was initiated by GE's Information Technology department in the course of backing up her computer, while GE offered evidence that Moffitt-Johnston was in possession of the computer at the time of the download and therefore conducted it herself. Subsequently, on October 9, 2012, another download was attempted to the same external hard drive but was blocked by exit controls that had been installed on Moffitt-Johnston's computer in the interim. The user attempting to the download the data could have entered a valid business justification that would have allowed the download to proceed, but instead abandoned the effort. Additionally, according to the DLP report, in the days prior to her departure, Moffitt-Johnston sent GE files via email to herself at outside email addresses.

AmSpec's entry into the cargo treatment market was "effectively announced" at the October 19, 2012 New York Harbor Show, an annual industry social event jointly hosted by GE and AmSpec. Having officially left GE two days prior, Moffitt-Johnston attended the event as a representative of AmSpec and was observed speaking with at least two GE customers, though the nature of these conversations is unknown. Over the next year, many of the customers to whom AmSpec provided cargo treatments had been customers of

GE to whom GE had provided cargo treatments during the year preceding Moffitt-Johnston's departure.

Based on Moffitt-Johnston's failure to disclose that she would be working for a competitor, alleged downloads of GE files, and alleged solicitations of GE customers, GE filed suit against Moffitt-Johnston and AmSpec, asserting 13 causes of action including, relevant here, breach of a covenant not to compete, misappropriation of trade secrets, and tortious interference with prospective business relationships. AmSpec and Moffitt-Johnston subsequently moved for summary judgment with respect to all 13 claims. GE filed a response, and AmSpec and Moffitt-Johnston moved to strike the DLP report, upon which GE had relied extensively in its response. The district court granted the motion to strike, ruling that the DLP report was a summary of evidence and that GE had not complied with the requirements of Federal Rule of Evidence 1006. The district court then granted summary judgment in favor of AmSpec and Moffitt-Johnston as to most of the causes of action alleged.

The case proceeded to trial on the remaining claims—breach of fiduciary duty, fraud, and unfair competition—limited to allegations that Moffitt-Johnston concealed her intention to work for a competitor. At trial, the district court allowed the DLP report to be admitted into evidence. The jury found liability as to all claims presented to it but awarded no damages. Subsequently, the district court awarded $217,189 in attorneys' fees to Moffitt-Johnston for her defense against the breach of the non-solicitation agreement claim.

GE appeals the summary judgment the district court granted in favor of Moffitt-Johnston and AmSpec regarding the non-solicitation agreement and the district court's denial of GE's motion for summary judgment regarding its claims for breach of a non-solicitation agreement, tortious interference with prospective business relationships, misappropriation of trade secrets, and

No. 15-20008

three related causes of action.  GE also appeals the award of attorneys' fees to Moffitt-Johnston.

## II

With regard to GE's claim that Moffitt-Johnston breached the non-competition agreement, the district court concluded, in the alternative, that GE put forth no evidence of breach.  We agree.

GE acknowledges that it has no "smoking gun" that Moffitt-Johnston solicited any former clients, arguing instead that "an extensive mosaic of facts . . . establishe[s] a strong circumstantial case."  GE offers four categories of evidence it believes collectively support an inference that Moffitt-Johnston solicited former customers of GE while working for AmSpec.  This court "review[s] a grant of summary judgment de novo, applying the same standard as the district court and viewing the evidence in the light most favorable to the non-moving party."[1]

First, GE points to the fact that Moffitt-Johnston downloaded over 27,000 GE files prior to departing, many of which contained client information, then lied about working for a competitor, supporting an inference that her motive was to "deprive GE of the opportunity to shore up its customer relationships before she could solicit their business."  The contention that Moffitt-Johnston must have solicited clients because she allegedly misappropriated files with their information amounts to speculation.

Second, GE references two incidents it believes constitute solicitations themselves.  Specifically, at the 2012 New York Harbor Show, Moffitt-Johnston was observed speaking with two GE customers.  However, there is no evidence as to the content of those conversations.  While the event's purpose was business development, there is evidence in the record that it was also largely

---

[1] *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 895 (5th Cir. 2013).

a social affair to which spouses and "significant others" were invited for dinner and a cruise.  As the district court observed, the non-solicitation covenant does not prohibit Moffitt-Johnston from *speaking* with any former clients; it prevents her from *soliciting* them "regarding products or services that are similar to or competitive with those [she] gained knowledge of while employed by [GE]."  The district court held that GE's belief that Moffitt-Johnston solicited customers at the New York Harbor Show is "mere speculation."  With no evidence that Moffitt-Johnston spoke with the clients at issue about AmSpec's services or even anything industry-related during this event, the district court's conclusion was correct.

GE also cites evidence suggesting that a representative of one of GE's customers, Statoil, had communications with Moffitt-Johnston.  GE argues that it is reasonable to infer from context that they spoke about business because an employee of this customer later told a GE employee, Kevin Kurtz, that he would "have to speak to" Moffitt-Johnston first before agreeing to conduct further business with GE.  However, the record contains only Kurtz's testimony as to what the GE customer's employee said.  GE did not cite this testimony when arguing in the district court that Moffitt-Johnston violated the non-solicitation provision.  Had GE done so, the district court undoubtedly would have ruled, correctly, that Kurtz's testimony was hearsay.  AmSpec had moved to strike Kurtz's testimony about this conversation with the GE employee, and the district court denied the motion on the basis that AmSpec did "not cite this testimony for the truth of the matter asserted, but rather to show that the statement was made.  It is therefore not hearsay."  GE cannot rely on this hearsay evidence to support a finding of breach.

In a "*see also*" reference in its brief in our court, GE cites to a string of emails in which, shortly after Moffitt-Johnson joined AmSpec, she communicated with a GE customer, Statoil, with whom she had worked while

No. 15-20008

at GE. AmSpec provided cargo treatment services to this customer in November 2012, and the emails that Moffitt-Johnson sent and received detail how that treatment was progressing, from the time the vessel was made available to AmSpec until the conclusion of the treatment process. The non-solicitation agreement provided that Moffitt-Johnson would not "communicate . . . with any Customer or Prospective Customer regarding products or services that are similar to or competitive with those I have gained knowledge of while employed by [GE]." It would seem that these exchanges might have been a breach of the non-solicitation agreement. But GE itself states that "it is unclear what the substance of the conversation was, context indicated it was business related." This evidence, without more, is speculative.

Third, GE argues that there is evidence in the record that Moffitt-Johnston engaged in "subterfuge" to violate the non-solicitation covenant, including supervising others to solicit GE customers. The covenant not to solicit provides that Moffitt-Johnston would not "assist another" in "solicit[ing], call[ing] upon, communicat[ing], attempt[ing] to communicate" any customer, and the agreement prohibits subterfuge, defined to include "accompanying others on calls . . . , supervising other persons in soliciting Customers . . . , [or] providing Confidential Information to others to assist them in soliciting or serving Customers or Prospective Customers." GE contends that Moffitt-Johnston's interactions and communications with Scott Hagstrom, violated these provisions. Hagstrom was hired immediately after Moffitt-Johnston to work as her director of sales. He was also restricted by a non-competition agreement with his former employer, another provider of treatment services. When AmSpec sales representatives contacted Hagstrom with an additives lead, he referred the employee to Moffitt-Johnston if his non-competition agreement precluded him from pursuing the lead. He understood that Moffitt-Johnston did the same. Additionally, Hagstrom

7

forwarded to Moffitt-Johnston an email chain between himself and representatives of a GE customer about scheduling an out-of-town meeting and discussing a potential transaction, which GE contends demonstrated that Hagstrom "kept Moffitt-Johnston abreast of his solicitation activities."

This evidence does not raise a triable issue as to whether Moffitt-Johnston violated the agreement. GE has put forth no evidence tying referrals between Moffitt-Johnston and Hagstrom to any sale by AmSpec. Moreover, Moffitt-Johnston is precluded from supervising Hagstrom's solicitation of GE's clients. She is not prohibited from supervising him in general or from working as a manager for a company with employees who solicit GE clients, absent some evidence that she directed those solicitation activities. The fact that Hagstrom forwarded her an email reflecting his activities for their common employer is not evidence of a violation.

Fourth, GE offers evidence "relating to AmSpec's immediate success in the cargo-treatment arena," referencing the fact that AmSpec made sales to certain GE customers soon after establishing its competing business and within a short time after the New York Harbor Show. However, the fact that AmSpec was quickly able to compete with GE is not evidence that Moffitt-Johnston solicited clients she was not permitted to solicit, especially in light of the fact that AmSpec had previously done inspection work for those same clients and therefore had existing relationships.

Although GE contends that these four categories of evidence, considered together, raise an inference that Moffitt-Johnston violated the non-solicitation covenant, none amount to more than speculation. Considered collectively, GE's evidence is not enough to raise a triable issue as to whether Moffitt-Johnston solicited any former GE customers, whether she directed solicitation of former GE customers, or whether improper conduct led to any sales by AmSpec. The

No. 15-20008

district court correctly held that there was no evidence that the non-solicitation agreement was breached.

## III

The district court also granted summary judgment in favor of Moffitt-Johnston and AmSpec on GE's misappropriation-of-trade-secrets claim. As a threshold matter, GE acknowledges that its misappropriation claim largely depends on the admissibility of the DLP report, which the district court excluded from the summary judgment record. We assume, without deciding, that the district court's exclusion was an abuse of discretion, and proceed with the analysis of this claim on the premise that the DLP report was admissible.

To prevail on a misappropriation of trade secrets claim, "a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant *used* the trade secret without authorization from the plaintiff."[2] Moffitt-Johnston and AmSpec do not contest that some of the information allegedly misappropriated could constitute trade secrets. The district court granted summary judgment on the second and third elements of the claim. We conclude that its decision was proper with respect to the use element.

"A cause of action for misappropriation of trade secrets accrues when the trade secret is *actually used*."[3] "As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or

---

[2] *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Gaia Techs. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 376 (5th Cir. 1999)) (emphasis in original).

[3] *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007) (quoting *Comput. Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)) (emphasis in original).

enrichment to the defendant is a 'use.'"[4]   However, "[p]roof of trade secret misappropriation often depends upon circumstantial evidence."[5]

GE's allegation that Moffitt-Johnston used the trade secrets at issue is based on circumstantial evidence.  Specifically, GE alleges that the following facts and circumstances, in combination, support a reasonable inference that Moffitt-Johnston used GE's trade secrets: "(1) Moffitt-Johnston created a [business] plan to sacrifice profit margin in order to gain market share; (2) Moffitt-Johnston emailed GE's most recent financial data to her AmSpec email account on her last day at GE [and downloaded 27,000 GE files in a deceptive manner]; [and] (3) AmSpec had success with the very clients whose financial data Moffitt-Johnston had just sent."

The "business plan" referenced by GE is a one-page draft plan prepared by Moffitt-Johnston for an interview with AmSpec, prior to being hired.  GE points to the fact that the business plan projects lower margins in Moffitt-Johnston's first two years on the job and notes, apparently as a goal and without any elaboration, "Get Market Share."  According to GE, from this business plan, "[i]t was reasonable to infer that Moffitt-Johnston used knowledge of GE's cost structure in order to acquire that market share."  But attempting to acquire market share, even in part through lower margins, is a natural goal for a business in its infancy, and it would be unreasonable to infer from this broadly stated objective that Moffitt-Johnston planned to use GE's trade secrets at the time she interviewed with AmSpec—much less that she ultimately *did* so.  The business plan contains no information suggesting that Moffitt-Johnston intended to capitalize on her knowledge of GE's cost

---

[4] *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir. 2013) (alteration omitted).

[5] *Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 598 (Tex. App.—Tyler 2013) *rev'd on other grounds*, 491 S.W.3d 699 (Tex. 2016).

structure.  GE contends that it "submitted AmSpec's financial data to buttress that inference."  But it is unclear what conclusions GE asks the court to draw from AmSpec's raw financial data, as GE does not explain how the data compares to its own, how it "buttress[es]" the inference that GE's confidential information was used to "gain market share," or anything else.

With respect to the fact that AmSpec enjoyed success with clients whose information Moffitt-Johnston allegedly misappropriated, it would likewise be unreasonable to infer from such success that AmSpec and Moffitt-Johnston used GE's trade secrets.  The mere fact of AmSpec's ability to compete does not itself suggest that AmSpec did so by misappropriating trade secrets.  GE does not explain or present any evidence of how, and to what degree, AmSpec obtained business from former GE clients, just that "many" of AmSpec's sales "are to customers that GE sold cargo treatments to within the twelve months prior to [Moffitt-Johnston's] departure."  Once again, the fact that GE submitted AmSpec's raw data, without any explication as to how the data compares to that of GE, does not support an inference that AmSpec's ability to obtain sales from customers with whom GE has worked is a result of using GE's trade secrets.  In any event, AmSpec had previously worked with the customers at issue in its capacity as an inspector, so the relationships were not entirely new.

With respect to evidence as to the circumstances under which Moffitt-Johnston allegedly obtained the trade secrets (through a download of data and emails to herself on the eve of her departure), GE asks the court to collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action.  As support for this analytical step, GE cites only to an unpublished case from a Texas court of appeals

11

reviewing the trial court's ruling with great deference.[6]  But there is no evidence of actual use.

Accordingly, we affirm the district court's grant of summary judgment on the misappropriation of trade secrets claim, as well as the claims for illegal use of confidential information and breach of a common-law duty with respect to confidential information, which track the misappropriation claim.

Separately, GE asserts in a footnote that if we rule that the DLP report is admissible (as we have assumed for the sake of argument), we should reverse the grant of partial summary judgment on GE's breach of fiduciary duty claim with respect to allegations that Moffitt-Johnston stole GE's files.  However, a claim for breach of fiduciary duty requires an injury to the plaintiff or a benefit to the defendant.[7]  For the same reasons GE has not established that Moffitt-Johnston or AmSpec actually used the trade secrets or that GE suffered any injury, it cannot establish a breach of fiduciary duty claim based on the misappropriation.  GE also asserts, in the same footnote, that the DLP report's admissibility compels the reversal of the district court's grant of summary judgment on GE's claim that AmSpec tortiously interfered with Moffitt-Johnston's employment agreement with GE.  However, as the district court correctly concluded, even if Moffitt-Johnston committed wrongdoing, GE has offered no evidence that AmSpec was involved.

---

[6] *See Molina v. Air Starter Components, Inc.*, No. 01-03-00175-CV, 2004 WL 1277491, at *4 (Tex. App.—Houston [1st Dist.] June 10, 2004, pet. denied) (mem. op.) ("[T]he inferences to be drawn from the . . . circumstances surrounding how the box was taken . . . , when viewed in support of the trial court's ruling, rationally support the trial court's conclusion that Molina had someone take the contents in the box from Air Starter so that he could reproduce Air Starter's product.").

[7] *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007).

No. 15-20008

## IV

The district court also granted summary judgment on GE's tortious-interference-with-prospective-business-relationships claim, which alleges that Moffitt-Johnston and AmSpec wrongfully interfered with GE's customer relationships. To establish a claim for tortious interference with prospective business relationships, a plaintiff must set forth evidence that:

> (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.[8]

Here, the only "independently tortious or unlawful act" alleged by GE is Moffitt-Johnston's breach of the non-solicitation agreement. As we have already concluded, there is no evidence that Moffitt-Johnston breached the non-solicitation agreement.[9] Accordingly, even if GE can establish a reasonable probability of entering into a business relationship with which Moffitt-Johnston and AmSpec interfered, its tortious interference claim fails.

## V

The district court concluded that the non-solicitation agreement was unenforceable and awarded Moffitt-Johnston attorneys' fees incurred in defending against GE's claim that she breached that agreement. Enforceability of a non-solicitation agreement is governed by the Covenants

---

[8] *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

[9] *See supra* Part III.

No. 15-20008

Not to Compete Act, Texas Business and Commerce Code § 15.50.[10]　Under the Act,

> a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.[11]

The parties do not dispute that the non-solicitation agreement was ancillary to an otherwise enforceable agreement, and Moffitt-Johnston has not challenged the eighteen-month duration of restraint.　The parties joined issue on whether the agreement contains "reasonable" limitations as to geographical area and the scope of the activity restrained, and whether the agreement imposes a greater restraint than necessary to protect GE's "goodwill or other business interests."

The terms of the non-solicitation agreement between Moffitt-Johnston and GE are set forth in the margin.[12]　Though there are geographical

---

[10] TEX. BUS. & COM. CODE § 15.50(a).

[11] *Id.*

[12] The agreement provides, in part:

> I acknowledge that, as a practical matter, it would not be possible for me to compete with the Company for Customers without making use of the Company's Confidential Information and its relationships with its customers. In order for the Company to protect such information and relationships, if I am employed by the Company in a position where I am evaluated based on my effectiveness at securing new customers, servicing customers, or retaining existing customers including, but not limited to, marketing, sales, channel distribution, field service, sales of global corporate accounts, or sales management, or in a position where I supervise other Company employees in performing such activities, then for the eighteen (18) consecutive calendar months immediately following termination/resignation of my employment with the Company i[r]regardless of the reason for such termination, I shall not directly or indirectly, for my benefit or the benefit of any other person or entity, solicit, call upon, communicate, or attempt to communicate, or assist another in doing so, with any Customer or Prospective Customer regarding products or services that are similar to or competitive with those I have gained knowledge

limitations if Moffitt-Johnston was employed in Louisiana or South Dakota, the parties do not contend that she was employed in either of those states, and the non-solicitation provision does not expressly set forth a geographical area in which Moffitt-Johnston was prohibited from soliciting with regard to GE's Customers or Prospective Customers in other areas.

However, because it is unnecessary to decide if the non-solicitation agreement was enforceable in resolving the attorneys' fee issue, we will assume, without deciding, that the non-solicitation agreement was unenforceable.  Under Texas Business & Commerce Code § 15.51(c), a court may award attorneys' fees to an employee who is sued by a former employer under a covenant not to compete or non-solicitation agreement if the employee (1) "establishes that the [employer] knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the [employer],"[13] and (2) "the [employer]

---

of while employed by the Company.  I will not engage in any subterfuge to circumvent this prohibition, including accompanying others on calls to Customers or Prospective Customers, contacting Customers or Prospective Customers with other persons, supervising other persons in soliciting Customers or Prospective Customers, providing Confidential Information to others to assist them in soliciting or serving Customers or Prospective Customers, participating in developing presentations to be made to Customers or Prospective Customers, or other similar activities.  If I am employed by the Company in Louisiana or South Dakota, I agree not to engage in the foregoing activities with respect to any Customer or Prospective Customer during the restricted period in any county or parish in which I solicited or served the Customer or Prospective Customer on behalf of the Company. If I am employed by the Company in Louisiana or South Dakota I acknowledge that I may request confirmation by the Company at any time of the parishes or counties in which the Customers or Prospective Customers are based and as to which the prohibitions of this paragraph shall apply.

[13] TEX. BUS. & COM. CODE § 15.51(c).

No. 15-20008

sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the [employer]."[14]

Moffitt-Johnston bore the burden of proof as to both of these prerequisites but failed to carry that burden. As GE asserted in the district court, in its opposition to Moffitt-Johnston's motion for attorneys' fees, and maintains in this court, there is no evidence that GE knew, "at the time of the execution of the agreement," that the non-solicitation agreement was unreasonable, assuming that it was.

Moffitt-Johnston argues that counsel for GE admitted in the district court that the non-solicitation agreement was "completely devoid of any geographic limitations." However, under Texas law, covenants not to compete and non-solicitation agreements are not void or unenforceable simply because they lack an express geographic limitation. Citing decisions of the Texas courts of appeals, the district court correctly concluded that "[i]n the absence of an explicit geographic scope, '[a] number of courts have held that a non-compete covenant that is limited to the employee's clients is a reasonable alternative to a geographical limit.'"[15] Accordingly, notwithstanding the text of § 15.50(a), a non-solicitation agreement may be enforceable under Texas law even if it does not expressly contain geographical limits.[16]

Moffitt-Johnston relies on the testimony of two GE employees, but neither had actual knowledge of the non-solicitation agreement's terms until

---

[14] *Id.*; *see also Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 924 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

[15] *GE Betz Inc. v. Moffitt-Johnston*, No. H-13-0459, 2014 WL 12596523, slip op. at *8 (S.D. Tex. June 6, 2014) (quoting *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)); *see Vogelsang*, 312. S.W.3d at 654-55 (collecting cases).

[16] *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 657 (Tex. 2006) (holding that a covenant not to compete was reasonable even though the covenant's restrictions applied regardless of geographic location).

16

this litigation arose, and neither was designated as GE's corporate representative as to the state of GE's knowledge when Moffitt-Johnston and GE consummated the agreement. One of these witnesses testified that she did not know what GE meant when the agreement was drafted, and her opinion that the agreement was customer-specific "irrespective of geography" was based on her lay understanding of the agreement when she was asked to read it, for the first time, during her deposition. The other GE employee testified that he did not know if the agreement contained any geographic limitations.

Moffitt-Johnston argued that GE's counsel took the position in the district court that there was an implied geographic limitation in the agreement but then took inconsistent positions as to what those restrictions were. Moffitt-Johnston points out that at one point GE's counsel argued that the implied limitation was the United States, Canada, North America and Panama, but that counsel subsequently directed Kurtz, a GE employee, to compile a list of customers that would come within the agreement. Kurtz included 20 GE customers on this list, based on hearsay, as discussed above. But none of this is evidence that at the time GE and Moffitt-Johnston executed the non-solicitation agreement, GE knew that it was unreasonable.

Though there is no evidence that GE actually (subjectively) knew when it signed the agreement that it was unreasonable (again, assuming that it was), Moffitt-Johnston contends that GE *must have known* at the time that the agreement was executed that it was unreasonable because, she asserts, the definitions of "Customer" and "Prospective Customer" are not limited to individuals with whom she actually worked and accordingly, the agreement is overly broad. The GE Employment and Confidential Information agreement, which includes the non-solicitation provisions, defines "Customer" and

17

"Prospective Customer."[17] "Customer" is defined in terms of a customer of GE with whom Moffitt-Johnston had contacts of a specified character. The district court concluded that "Customer" could be construed to include a multi-national corporation and therefore, that Moffitt-Johnston would have been prohibited from soliciting business at refineries or locations other than those with whom she had actual contact or involvement while at GE. We think it unreasonable to read the definition of "Customer" so broadly. The agreement instead connotes that in order to have been a "Customer," there must have been actual communication or contact between "the Customer" and Moffitt-Johnston that concerned provision or the potential provision of a service or product. Employees of a multi-national corporation with whom Moffitt-Johnston had no contact, and who worked in a refinery with which Moffitt-Johnston had done no business, would not qualify as a "Customer" because the requisite nexus of contact for the purpose of transactions could not exist. This is reinforced by the descriptions of those whom "Customer" included: "representatives of the

_____

[17] The terms are defined as follows:

> "Customer." The term "Customer" refers to any current customer of the Company, including representatives of the customer, key decision-makers for the customer, plant managers, purchasing agents, technical representatives, or any other employee or consultant providing services for the customer, with whom I had any contact or communication or about whom I developed, received, or learned Confidential Information during the eighteen (18) consecutive calendar months preceding termination of my employment with the Company if such contact or communication was with a view to or for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service, or equipment sold, offered for sale, provided, or under development by the Company.
> "Prospective Customer." The term "Prospective Customer" refers to all entities (i) for whom I have assisted in the Company in making a written proposal within the twelve (12) calendar months preceding termination of my employment with the Company, or (ii) for whom [I] have made at least two (2) prospect calls during the twelve (12) calendar months preceding termination of my employment with the Company.

customer, key decision-makers for the customer, plant managers, purchasing agents, technical representatives, or any other employee or consultant providing services for the customer, with whom I had any contact or communication or about whom I [Moffitt-Johnston] developed, received, or learned Confidential Information." Similarly, the term "Prospective Customer" is defined with reference to Moffitt-Johnston's personal involvement while employed by GE.

The parties have not cited, and we have not found, a Texas court decision that resolves whether the knowledge component of Texas Business & Commerce Code § 15.51(a) is a subjective one, requiring actual knowledge, or whether the fact that an employer "knew at the time of the execution of the agreement" that the covenant was unreasonable can be imputed by showing that objectively, a reasonable person would know, based on Texas law, that the agreement was unreasonable. Even assuming, without deciding, that knowledge of Texas law as it existed when the agreement was signed is imputed to GE, it is not clear that under Texas law, the definitions of "Customer" and "Prospective Customer" are overly broad. We cannot say that any reasonable person who read the covenant would or should have known that it was unreasonable. Indeed, a Texas court has found a similar provision to be reasonable, though the challenges to the clause in that case were arguably different.[18]

---

[18] *See Alex Sheshunoff Mgmt. Servs.*, 209 S.W.3d at 656-57 (rejecting the contention that the agreement was overly broad because "its restriction on [the employee's] solicitation of certain of [the employer's] prospective clients and 'affiliation members' is unrelated to any training or confidential information [the employer] provided [the employee] after he signed the employment agreement," and concluding that the following covenant "was reasonable,":

> Employee will not
> (i)     directly or indirectly, as an owner, employee, independent contractor or otherwise, provide consulting services to banks, savings and loans or other financial institutions where the

No. 15-20008

We note, however, that GE advocated positions in the district court that may have influenced the court in reaching the conclusion that the non-solicitation agreement was overly broad and therefore unreasonable. GE offered the affidavit of its employee Kevin Kurtz, which listed 20 names and opined that each fell within the definition of "Customer" or "Prospective Customer." Many were short-hand identifiers of nationally- and internationally-known names such as "Exxon Mobil." The district court excluded this affidavit, however, because it was not based on personal knowledge, and it is not evidence in the case. Most of the names in Kurtz's affidavits do not appear to identify an actual corporate entity because those names are not followed by "Inc." or "Corp." or similar indicia of a corporate entity. While this is evidence that GE sought to enforce the agreement to a greater extent than was necessary to protect the goodwill or its other business interest, it is not evidence that GE knew at the time of the execution of the agreement that the restraints in the non-solicitation agreement were unreasonable.

GE presented evidence to the district court that prior to the time that the agreement with Moffitt-Johnston was reached, a court in North Carolina had enforced GE non-solicitation agreements identical to the one in Moffitt-Johnston's contract. That decision was upheld on appeal,[19] though after the

---

Employee has provided fee based services in excess of 40 hours within the last year of employment, or with which Employee has conducted significant sales activity, including, but not limited to, more than one sales call, preparation of a sales proposal and actual sales, within the last year of employment. This restriction applies regardless of geographic location, it being acknowledged by the parties that Employer's clients are not confined to a particular geographic area;

(ii)     solicit or aid any other party in soliciting any affiliation member or previously identified prospective client or affiliation member. . . .)

[19] *GE Betz, Inc. v. Conrad*, 752 S.E.2d 634 (N.C. App. 2013).

No. 15-20008

date of the agreement at issue in the present case. The North Carolina court of appeals rejected the argument that the non-solicitation agreements were overly broad and against North Carolina public policy.[20] The court reasoned that the agreements "did not exceed the scope necessary to protect GE's business."[21] We reference these decisions, not for any legal proposition, but as some evidence that GE had reason to think that the non-solicitation provisions were not overly broad.

Because there was no evidence that when GE executed the non-solicitation agreement with Moffitt-Johnston, GE knew the covenant was unreasonable, Moffitt-Johnston has not met the requirements of Texas Business and Commerce Code § 15.51(c). Therefore, she was not entitled to recover attorneys' fees.

\*    \*    \*

For the reasons set forth above, we AFFIRM the district court's judgment in part and VACATE the award of attorneys' fees.

---

[20] *Id.* at 645.
[21] *Id.*

21