# United States Court of Appeals
# for the Fifth Circuit

No. 24-30201

United States Court of Appeals
Fifth Circuit

**FILED**
June 23, 2025

Lyle W. Cayce
Clerk

Torriana Clark,

*Plaintiff—Appellant*,

*versus*

Department of Public Safety and Corrections, State of
Louisiana; Lance Wallace, *Sergeant*; Travis Day, *Warden*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CV-6293

Before Elrod, *Chief Judge*, and Higginbotham and Southwick,
*Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Plaintiff–Appellant Torriana Clark, an inmate at Rayburn Correctional Center (RCC) in Louisiana, sued prison officials under 42 U.S.C. § 1983, asserting that prison officer Lt. Lance Wallace used excessive force against him in violation of his constitutional rights. The district court granted partial summary judgment for Defendants–Appellees on the grounds that Clark's § 1983 claim was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). For the reasons that follow, we AFFIRM the district

court's grant of partial summary judgment and its denial of Clark's motion for leave to amend his § 1983 petition.

## I

## A

According to Clark's § 1983 petition, he began to feel sick, weak, and unsteady after exercising in RCC's yard, so he laid down in his bunk. When the dorm officer was making rounds, Clark left his bunk to seek help but fell due to weakness, nausea, and dizziness, and he informed the officer that he needed medical attention. Clark alleges that he attempted to sit down on a bunk, but the officer grabbed him and forced him against the wall, and another officer then approached and handcuffed him.

Clark alleges that other officers then arrived to help escort him out of the dorm, but when his feet gave way, one of the officers threw him onto a bunk. At that point, he alleges, Wallace began violently twisting his ankle and choking him. Clark alleges that he blacked out briefly from the choking, and when he reawakened, officers were dragging him out of the dorm. In particular, he alleges that Wallace was pushing him and saying, "Walk faster, before I make you walk!" Clark then alleges that Wallace, "dissatisfied with [Clark's] efforts to walk," forced him to the ground knocking him unconscious again. When he awoke, there was blood on the ground and running down his face, his face felt numb, and he could not breathe through his nose. When Clark began crying and "asking why," Wallace allegedly grabbed his arm and jerked him upward, saying, "Get the f—k up and walk! Before I do it again!"

Clark's allegations are contradicted by the reports prepared by prison officers after the incident. According to these reports, the dorm officer was making rounds in Clark's dorm when he noticed Clark jumping up and down and yelling, "Baby!" while approaching him. The officer ordered Clark to

"get back," but Clark continued to approach him and yell. The officer summoned assistance and grabbed Clark's arm, after which Clark tried to pull away. The officer then pushed Clark against the wall after Clark continued to refuse directions to stop resisting and attempted to pull away.

Several officers, including Lt. Brian Nichols, placed Clark in handcuffs, but Clark "remained combative and continued to resist." Nichols "directed [Clark] to the bed and continued to give orders to stop resisting," grabbing him by the upper torso. Wallace placed pressure on Clark's shoulder while giving orders to stop resisting. Then, out of sight of Nichols, who was facing Clark's head, Wallace and another officer secured Clark's ankles. Wallace stated that when he saw Clark begin to kick his legs, he put Clark's right ankle in an ankle lock and continued giving orders to stop resisting. When Clark "began to comply," Nichols released his upper torso and Wallace released his ankle, and the officers helped Clark to his feet.

Wallace and another officer then moved to escort Clark out of the dorm. But, as Wallace recounted, Clark "began jumping up and down while twisting his body being combative." Wallace then "took control of . . . Clark's upper torso[,] directing him to another near by bed" and then to the floor. On the floor, Wallace applied pressure to Clark's upper torso while giving orders to stop resisting. When Clark began to comply, the officers helped him to his feet again.

Wallace and the other officer placed Clark in an "off-balance escort position" to walk him out of the dorm while giving him "multiple orders to walk to no avail." After an attempt to reestablish the escort position and walk with Clark, they reached the hallway, where Clark yelled, "Time for y'all to feel my pain I go through." Wallace and the other officer directed Clark to the ground again, continuing to order him to stop resisting. When Clark agreed to walk again, the officers picked him up and escorted him to the

No. 24-30201

infirmary without further incident. On the way to the infirmary, the other officer asked Clark if he had smoked something that made him act as he did, and Clark admitted that he had "hit a blunt" with "[s]omething different" in it.

B

RCC officers submitted two disciplinary reports and eleven supplemental Unusual Occurrence Reports (UORs) related to the incident involving Clark.[1]

The first disciplinary report, signed by Nichols, describes Nichols's involvement in the incident from his perspective. It describes Nichols's efforts to restrain Clark on the bunk after he was directed down from the wall, and ends with the following description:

> Shortly afterwards Offender Clark began to comply with orders and I released Offender Clark's upper torso. At this point, all use of force ceased. All Officers were examine[d] by Nurse Alana Seay with no injuries to note. Offender Clark was seen by Nurse Sheret Luper.

---

[1] RCC Directive #3.3.1, the document that lays out the facility's "procedures for preparing and processing disciplinary reports," states that "[a]n employee who has reason to believe or has knowledge that an offender has violated one or more of the rules, in the Disciplinary Rules and Procedures for Adult Offenders booklet . . . , will prepare a report on the disciplinary report form." The form must include the following information: "specific rule(s) violated; a formal statement of the charge; any unusual offender behavior; any staff witnesses; . . . any immediate action taken, including the use of force; [and] reporting staff member's signature and date and time of report." "Unusual Occurrence Reports prepared by employee(s) other than the reporting employee regarding the same offense, will be attached to the disciplinary report as a supplement to it." The disciplinary "report and related documents" are then reviewed by the Shift Supervisor and placed in a box for review by the Disciplinary Board.

The Nichols Report does not include any narrative of Wallace's actions, nor does it include any account of the events that occurred between when Nichols released Clark's upper torso and when Clark reached the infirmary. The Nichols Report charged Clark with one count each of "Defiance" and "Aggravated Disobedience," to which he pleaded guilty. Pursuant to the report, Clark was sentenced to 60 days' loss of good-time credits for each count and $24 in restitution for his medical care.

The second disciplinary report, signed by Wallace, describes his involvement in the incident from his perspective. The events described in the Wallace Report overlap in part with the events in the Nichols Report, starting with Wallace's description of his efforts to help Nichols to restrain Clark on the bunk. But it also details events between when Nichols released Clark's upper torso and when Clark reached the infirmary, including Clark's continued resistance and Wallace's continued actions to restrain him. The Wallace Report charged Clark with one count each of "Defiance" and "Aggravated Disobedience," for which no plea by Clark is recorded. Clark was sentenced to 30 days' transfer to disciplinary segregation for the first charge and 60 days transfer to disciplinary segregation for the second charge, as well as $24 in restitution for his medical care.

The eleven supporting UORs were prepared by various prison officers, including Wallace and Nichols. The UORs describe additional events related to the incident from the perspectives of their respective authors.

C

Clark sued Wallace, RCC Warden Travis Day, and the Louisiana State Department of Public Safety and Corrections in connection with the incident. He pleaded a federal § 1983 claim against Wallace for excessive use of force, a state-law negligence claim against Day for allegedly failing to

respond to previous reports of Wallace's alleged inappropriate behavior, and a state-law vicarious liability claim against the Department for Wallace's and Day's independent torts. Defendants–Appellees removed the case to federal district court.

In their answer, Defendants–Appellees raised both the *Heck* doctrine and qualified immunity as affirmative defenses.

Months later, Clark filed a motion asking the district court to set a briefing schedule on both the *Heck* issue and the qualified immunity issue. He explained that the court had set a deadline at a prior status conference for the parties to address the *Heck* issue and that "Defendants intend to file a motion on Qualified Immunity, which should be heard as a preliminary matter." The district court set a briefing schedule for the *Heck* issue but otherwise denied the motion.

Defendants–Appellees then moved for summary judgment, seeking dismissal of Clark's § 1983 claim as *Heck*-barred and dismissal of his state-law claims under analogous Louisiana law. Clark opposed the motion but did not object to any evidence, and he asked the district court for leave to amend his pleadings if it determined that his claims were barred.

The district court granted Defendants–Appellees' motion for summary judgment in part, concluding that Clark's § 1983 claim was *Heck*-barred and that amendment of his pleadings would be futile. It declined to rule on his state-law claims and remanded them to state court, denying the motion for summary judgment to the extent that it sought dismissal of those claims with prejudice.

Clark now appeals: (1) the district court's partial grant of summary judgment on the grounds that his § 1983 petition was *Heck*-barred; (2) the district court's denial of leave to amend his petition; and (3) the district

court's denial of Clark's motion to set a briefing schedule on the issue of qualified immunity.[2]

## II

We turn first to the *Heck* issue, concluding that the district court did not err in granting partial summary judgment for Defendants–Appellees on this issue.

## A

We review a district court's ruling on a motion for summary judgment *de novo*. *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 215 (5th Cir. 2024). "In doing so, we view all facts in the light most favorable to the non-movant . . . and draw all reasonable inferences in his favor." *Gray v. White*, 18 F.4th 463, 467 (5th Cir. 2021).

Because *Heck*'s favorable-termination requirement is an element of Clark's § 1983 claim, not an affirmative defense, Clark bears the burden of proving that *Heck* does not bar his § 1983 claim. *See Hoog-Watson v. Guadalupe County, Tex.*, 591 F.3d 431, 435 (5th Cir. 2009) (citing *Brandley v. Keeshan*, 64 F.3d 196, 199 (5th Cir. 1995), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007); *Krueger v. Reimer*, 66 F.3d 75, 76 (5th Cir. 1995)); *Heck*, 512 U.S. at 487 (if judgment in plaintiff's favor would necessarily imply invalidity of his conviction or sentence, § 1983 petition

---

[2] Because we are affirming the district court's handling of the first two issues, Clark's appeal on the third issue is moot. Nonetheless, we remind the district court that "[b]ecause qualified immunity is an *immunity from suit*, not merely a defense to liability," "a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation." *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021). "This scheme prevents a defendant entitled to immunity from being compelled to bear the costs of discovery and other pre-trial burdens." *Id.*

"must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated").

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond his pleadings and designate specific facts showing that there is a genuine dispute of material fact for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

B

Section 1983 "allows plaintiffs to seek damages from persons who violate their constitutional rights while acting under color of state law." *Gray*, 18 F.4th at 467. "Ordinarily, use of force by a prison officer would qualify for § 1983 liability based on the Eighth Amendment if the force was not applied 'in a good faith effort to maintain or restore discipline' but rather 'maliciously and sadistically for the very purpose of causing harm.'" *Dewan*, 858 F.3d at 334 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)).

But under *Heck*, a prisoner may not "seek[] damages in a § 1983 suit" if "a judgment in favor of the [prisoner] would necessarily imply the invalidity of his conviction or sentence." *Id.* (first alteration in original) (quoting *Heck*, 512 U.S. at 487); *see Aucoin v. Cupil*, 958 F.3d 379, 380 (5th Cir. 2020). This is because "[c]hallenges to the *validity* of any confinement or to particulars affecting its *duration* are the province of habeas corpus,"

whereas "requests for relief turning on *circumstances* of confinement may be presented in a § 1983 action." *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (emphasis added); *see also Aucoin*, 958 F.3d at 380 ("[W]e do not allow the use of § 1983 to collaterally attack a prior criminal proceeding, out of concern for finality and consistency." (citing *Ballard v. Burton*, 444 F.3d 391, 397 (5th Cir. 2006))).

"Because *Heck* applies to the duration of confinement, it applies not just to criminal convictions but also to prison disciplinary rulings that 'result[] in a change to the prisoner's sentence, including the loss of good-time credits.'" *Santos v. White*, 18 F.4th 472, 476 (5th Cir. 2021) (alteration in original) (quoting *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998) (en banc)); *see Gray*, 18 F.4th at 467. "*Heck* therefore bars claims that would, if accepted, 'negate' a prison disciplinary finding that had resulted in the loss of good-time credits." *Santos*, 18 F.4th at 476 (quoting *Bourne v. Gunnels*, 921 F.3d 484, 491 (5th Cir. 2019)).

But "*Heck* is not 'implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence.'" *Id.* (quoting *Muhammad*, 540 U.S. at 751). It therefore does not bar a § 1983 claim when the factual basis for that claim "is temporally and conceptually distinct" from the factual basis for the conviction. *Bush v. Strain*, 513 F.3d 492, 498 (5th Cir. 2008). It also does not bar a § 1983 claim where the sanctions imposed for a prisoner's disciplinary violations were "fines and loss of privileges," because such sanctions "bear on the 'circumstances of confinement' rather than that confinement's 'validity' or 'duration.'" *Gray*, 18 F.4th at 468 (quoting *Muhammad*, 540 U.S. at 750); *see Santos*, 18 F.4th at 476–77 ("[I]n applying *Heck*, a court must bar only those claims that are 'necessarily at odds with' the disciplinary rulings, and only with those rulings that resulted in the loss of good time credits." (quoting *Aucoin*, 958 F.3d at 383)).

"Determining whether the § 1983 claim challenges the conviction is 'fact-intensive, requiring us to focus on whether success on the . . . claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction.'" *Aucoin*, 958 F.3d at 382 (alteration in original) (quoting *Bush*, 513 F.3d at 497); *see Bush*, 513 F.3d at 498 ("the crux of the [*Heck* issue] is whether the factual basis for [the plaintiff's] excessive force claim is inherently at odds with the facts actually or necessarily adjudicated adversely to [the plaintiff] in the criminal proceeding").

Ultimately, to overcome the *Heck* bar, a § 1983 plaintiff must prove that the underlying proceedings terminated in his favor. *See Hoog-Watson*, 591 F.3d at 435; *Heck*, 512 U.S. at 487. Absent such a showing, a *Heck*-barred claim must be "dismissed with prejudice to [its] being asserted again until the *Heck* conditions are met." *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 657 (5th Cir. 2007) (quoting *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996)).

## C

Defendants–Appellees, as movants, have met their summary judgment obligation by pointing the court to the absence of admissible evidence showing that the factual basis for Clark's § 1983 claim "is temporally and conceptually distinct" from the factual basis for his prison disciplinary convictions. *Bush*, 513 F.3d at 498. The onus therefore falls on Clark to designate specific facts showing that there is a genuine dispute of material fact for trial as to whether his claim is *Heck*-barred. *See Little*, 37 F.3d at 1075.

In an attempt to satisfy this burden, Clark points to the Nichols Report, which sentenced him to loss of good-time credit, and to the Wallace Report, which did not sentence him to loss of good-time credit and which

describes events that occurred after those described in the Nichols Report. He asserts that these reports must be considered separately, as describing separate encounters, such that his § 1983 claim—which is primarily based on the events described in the Wallace Report—are not *Heck*-barred on account of the sentence imposed under the Nichols Report.

This evidence fails to satisfy Clark's summary judgment burden. Regardless of whether the Nichols Report and the Wallace Report are viewed as describing two separate incidents or one continuous incident, success on Clark's § 1983 claim would "require[] . . . proof of a fact that is inherently inconsistent with one underlying the criminal conviction" for which he lost good-time credits in the Nichols Report. *Aucoin*, 958 F.3d 379 (quoting *Bush*, 513 F.3d at 497). Specifically, a ruling in Clark's favor on his § 1983 claim would require proof of the allegation, which Clark repeats throughout his petition, that he was not engaged in *any* resistance during the time that he interacted with Wallace. If that fact were proven, it would be "strictly incompatible" with the factual basis for Clark's convictions under the Nichols Report, which included factual allegations—to which Clark pleaded guilty—that he *was* engaged in resistance during that time. *Aucoin*, 958 F.3d at 382–83. Furthermore, even though Wallace's actions are not described in the Nichols Report, video footage of the events indicates that at least some of his actions took place simultaneously with Clark's resistance recorded in the Nichols Report that formed part of the basis of his disciplinary convictions for which he lost good-time credit.

Because Clark has failed to satisfy his summary judgment burden on the *Heck* issue, the district court did not err in granting partial summary judgment for Defendants–Appellees on this issue.

No. 24-30201

III

We next consider the district court's denial of Clark's request for leave to amend his petition, concluding that it did not err in denying this request.

A

We generally review a district court's denial of leave to amend the pleadings for abuse of discretion. *Def. Distributed v. Platkin*, 55 F.4th 486, 494 (5th Cir. 2022). "However, where, as here, the district court's denial of leave to amend was based solely on futility, we apply a *de novo* standard of review . . . ." *Id.* (alteration in original) (quoting *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010)).

B

Leave to amend pleadings should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Rule 15(a)(2) "evinces a bias in favor of granting leave to amend," *Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S.A. Co.*, 195 F.3d 765, 770 (5th Cir. 1999) (quoting *Dussouy v. Gulf Coast Inv. Corp*, 660 F.2d 594, 597 (5th Cir. 1981)), leave to amend "is by no means automatic," *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994). But "unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Dussouy*, 660 F.2d at 598. Such substantial reasons include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir.

12

2003) (alteration in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Amending pleadings would be futile "if the complaint as amended would be subject to dismissal." *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009)). Futility is evaluated "under the same standards as a dismissal under Rule 12(b)(6)." *Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427, 437 (5th Cir. 2021).

C

Here, the district court did not err in denying Clark leave to amend his petition.

Clark requested leave to amend his petition so that he could revise it to more closely track the events depicted in the videos of the incident, which Defendants–Appellees produced for the first time at the summary judgment stage. He maintains that doing so would allow him to show that he "did nothing to deserve the malicious cork screwing of his leg, choke holds, choking, slamming and punching" allegedly perpetrated by Wallace. The district court concluded that amendment would be futile because "the fact that Clark maintains he did nothing wrong indicates that his petition is inconsistent with his guilty pleas for defiance and aggravated disobedience in connection with the Nichols [R]eport."

Reviewing *de novo*, we conclude that substantial reason to deny leave to amend exists. Even if Clark were to amend his petition to add details depicted in the video, the petition would still be subject to dismissal. Having reviewed the video, we see no events depicted in it that would change our *Heck* analysis sufficiently for Clark to prevail, regardless of whether the Nichols Report and the Wallace Report are viewed as describing two separate

incidents or one continuous incident.  It would therefore be futile to allow him to amend his petition.

## IV

For the reasons explained, we AFFIRM both the district court's grant of partial summary judgment on the *Heck* issue and its denial of Clark's motion for leave to amend his petition.