# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 14, 2026

Lyle W. Cayce
Clerk

————————

No. 25-40194

————————

Providence Title Company,

*Plaintiff—Appellant*,

*versus*

Truly Title, Incorporated; Kim Sheets-Sheffield;
Graham Hanks,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
Civil Action No. 4:21-CV-147

———————————————————————

Before Richman, Engelhardt, and Wilson, *Circuit Judges*.

Per Curiam:[*]

After merger negotiations between their two companies fell through, Tracie Fleming, an executive at Providence Title, pursued employment at Truly Title through her friend, Graham Hanks, the head of Truly's Texas operations. Upon securing employment at Truly, Fleming, her husband, and another former Providence manager facilitated a significant move of

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-40194

Providence employees and clients to Truly.  In the aftermath, Providence brought numerous claims against Truly, Hanks, and the employees involved, including various contractual and business tort claims under Texas law. Providence appeals the dismissal of several of these state law claims.  We affirm as to all.

## I.

Providence Title Company and Truly Title are competitors in the Texas title insurance market.  In 2019, Truly hired Graham Hanks to lead their operations in Texas.  Shortly after joining Truly, Hanks and his friend Tracie Fleming, the President of Providence, discussed joining forces as a single "dream team."  Hanks and Fleming initiated merger discussions between their two companies, and the pair hoped that Truly's acquisition of Providence would be a "great fit" for both firms.

When negotiations began in April 2019, the parties entered into a two-year nondisclosure agreement (NDA) to protect confidential information exchanged during negotiations.  Truly also signed a non-solicitation agreement (NSA) in May 2019, "agree[ing] to a one-year non-solicitation of Providence Title employees."  With these agreements in hand, Providence provided Truly with hundreds of documents describing the firm's organization, top performers, and benefits.  These documents included Providence's profit and loss statements, details about employee compensation structures, and partnership agreements.  Much of the material was exchanged via confidential file sharing websites and email, and Truly was granted access to Providence's QuickBooks files.

Truly also hired a business consultant, Chris Cranton, to study these documents and provide recommendations.  Cranton identified several profitable Providence locations in North Texas, including offices in Southlake and Johnson County.  Cranton also recommended delaying the

2

proposed acquisition until late 2020 to maximize Truly's profit from the deal. Cranton provided his analysis to Truly's CEO, Michael Tafoya, as well as the company's President and COO, Mike Kirby.

After seven months of merger discussions, negotiations broke down in November 2019. Tafoya testified that the merger failed because Providence demanded that Truly sign a ten-year master service agreement with Providence's preferred law firm to perform document preparation after the companies merged. Providence insists that Truly only objected to the agreement to sabotage the acquisition and begin competing with Providence, armed with troves of confidential information that Truly had acquired during negotiations. Whatever the reason for the impasse, negotiations stalled, and no new information was exchanged for several months.

In July 2020, Tracie Fleming contacted Hanks to discuss leaving Providence for Truly. The two discussed in detail her potential employment and the possibility of opening new Truly offices under Fleming's supervision. While she was at it, Fleming also negotiated a position at Truly for her husband, Mark Fleming, down to setting his compensation and benefits. At the time, Mark Fleming was a Team Leader for Providence's Johnson County offices. Between November 2020 and February 2021, both Tracie and Mark Fleming assessed potential office locations with Hanks, and Tracie Fleming identified other Providence executives who might be willing to jump ship. In December 2020, Truly made formal job offers to the Flemings, which they promptly accepted. The Flemings resigned from Providence on February 3, 2021.

Truly then moved quickly to open new offices in Johnson County, anticipating that many Providence employees would move over. A few days before resigning, Tracie Fleming had informed Hanks that Truly could begin recruiting Providence employees the following weekend after her resignation

took effect.    After resigning, Mark Fleming told his coworkers at Providence's Johnson County offices that they could speak with him if they had any interest in his new employer, and within a few hours several employees had called him to seek employment at Truly.  He provided Tracie Fleming with a list of interested employees, which she used to develop attractive job offers.  In most instances, Truly offered Providence employees compensation that slightly exceeded their pay at Providence.

During this same period, Kim Sheets-Sheffield, a Team Leader at Providence's Southlake office, separately made plans to join Truly.  Sheets-Sheffield began discussing her potential employment with Hanks in November 2020 and expressed the hope that some of Providence's Southlake employees would follow her.  While still employed at Providence, Sheets-Sheffield told Hanks about the salary and office equipment needs of Southlake employees and coordinated with Truly to find suitable locations for a new Southlake office.  Before leaving Providence, Sheets-Sheffield organized a "happy hour" for her team that doubled as a group interview with Hanks and Ray Byrns, a Truly recruiter.  On February 1, 2021, Sheets-Sheffield resigned from Providence, and the happy hour took place that same evening.  Eventually, all Providence employees who attended the happy hour moved to Truly.  After joining Truly, Sheets-Sheffield also began soliciting former Providence clients, promising:  "Same team, just new company."  As a result, Providence lost significant business to Truly.

There is no evidence that the Flemings coordinated their efforts with Sheets-Sheffield, though Tracie Fleming learned that Truly was recruiting Sheets-Sheffield before January 2021.  That month, both Mark Fleming and Sheets-Sheffield declined to recommend raises for employees under their supervision at Providence.  And after Sheets-Sheffield resigned with some of her subordinates, Tracie Fleming briefly participated in Providence's public relations response, despite her own plans to join Truly.

No. 25-40194

Providence filed this action in February 2021. Initially, Providence alleged a raft of claims against Truly and Hanks (collectively, Appellees), including (1) violation of the federal Defend Trade Secrets Act (DTSA), (2) conspiracy to violate DTSA, (3) violation of the Texas Uniform Trade Secrets Act (TUTSA), (4) knowing participation in a breach of fiduciary duty, (5) tortious interference with the shareholders' agreement, (6) tortious interference with prospective contractual relationships, (7) tortious interference with prospective customer relationships, and (8) civil conspiracy. Providence also alleged claims against Truly alone for breach of the NDA and breach of the NSA. Providence asserted additional claims against the Flemings and against Sheets-Sheffield, but the parties settled those claims.

The district court granted summary judgment to Appellees on Providence's federal trade secrets claims. The district court exercised supplemental jurisdiction over the remaining state law claims and granted summary judgment on most of those too. The only claim to survive summary judgment was Providence's claim that Truly violated the NSA, but the district court dismissed that claim and entered final judgment after both parties moved for dismissal. Providence now appeals the dismissal of several of its state-law contractual and tort claims.

## II.

We review a district court's grant of summary judgment *de novo*. *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Clark v. La. Dep't of Pub. Safety & Corr.*, 141 F.4th 653,

659 (5th Cir. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  All reasonable inferences are drawn in favor of the nonmovant, but the nonmovant "cannot satisfy his summary judgment burden with [conclusory] allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Perez v. United States*, 312 F.3d 191, 194–95 (5th Cir. 2002) (per curiam) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).  Summary judgment is appropriate if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.

We begin with Providence's claim that Appellees knowingly participated in a breach of fiduciary duties by Providence employees.

Under Texas law, "[w]hen a third party knowingly participates in [a] breach of fiduciary duty, the third party becomes a joint tortfeasor and is liable as such."  *Graham Mortg. Co. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.–Dallas 2010, no pet.) (quotation omitted).  Here, a successful claim of knowing participation in a breach of fiduciary duties would require that (1) a fiduciary relationship existed between Providence and one of its employees; (2) Appellees knew of the fiduciary relationship; and (3) Appellees were aware that they were participating in a breach of the fiduciary relationship. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).  To survive summary judgment, Providence must proffer evidence that Appellees "contributed to, induced, or facilitated the other party's breach of its fiduciary duty."  *Caliber Home Loans, Inc. v. Cove*, No. 22-cv-02298, 2025 WL 71983, at *14 (N.D. Tex. Jan. 10, 2025) (quoting *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 573 (N.D. Tex. 2024)).

Providence contends that Tracie Fleming, Mark Fleming, and Kim Sheets-Sheffield all owed fiduciary duties to Providence and that each

breached those duties with the knowing participation of Appellees. We address the allegations involving each of them in turn.

## A.

Providence's most substantial claim alleges that Appellees knowingly participated in a breach of fiduciary duties by Tracie Fleming. There is no dispute that Fleming, as President of Providence, was a fiduciary of her company. *See Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576–77 (Tex. 1963); *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.–Houston [14th Dist.] 1997, pet. denied). Less settled is whether she breached her fiduciary duties and whether Appellees knowingly participated in any breach. Providence's allegations may be divided into three categories: (1) actions by Fleming during her employment at Providence that did not constitute a breach of fiduciary duties; (2) actions taken by Fleming that at least arguably *did* constitute a breach; and (3) Fleming's activities after she left Providence and her fiduciary relationship with the firm ended.

## 1.

Some of Fleming's actions in this case were permissible under Texas law. In Texas, an employee:

> may properly plan to go into competition with his employer and may take active steps to do so while still employed. Such an employee has no general duty to disclose his plans to his employer. Even [a] fiduciary relationship between the employee and employer does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties.

*Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 284 (5th Cir. 2007) (internal quotations and citations omitted); *see also Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002). Employees may jointly plan

to compete with their employer while still employed and need not disclose their plans. *See Johnson*, 73 S.W.3d at 201; *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.–Houston [1st Dist.] 2003, no pet.).[1]

Providence points to Hanks's discussions with Tracie Fleming concerning her employment at Truly, beginning in the summer of 2020, as evidence of Appellees' knowing participation in a fiduciary breach. Providence notes the pair's discussion of potential office locations, as well as Fleming's message to Hanks that she planned to "go over" salary needs for Providence employees to assist in preparing attractive offers for those workers after she joined Truly. Providence also asserts that Truly's offer to include Fleming in a "bonus pool," which would boost her compensation depending on the success of the offices she would manage, incentivized further breaches.

But none of these acts constituted a breach of fiduciary duty on Fleming's part. Texas employees are free to "mak[e] preparations for a future competing business venture" without violating a fiduciary duty. *Navigant Consulting*, 508 F.3d at 284 (quotation omitted). And the scope of permissible preparations under Texas law is broad. *See, e.g.*, *Ameristar Jet Charter, Inc. v. Cobbs*, 184 S.W.3d 369, 374 (Tex. App.–Dallas 2006, no pet.) (starting a competing business while still employed did not breach a fiduciary duty). The above actions alleged by Providence do not run afoul of this rule: Fleming was allowed to seek out competing employment, prepare to open and staff new offices in this new venture, and determine her future

---

[1] Providence observes, correctly, that Fleming was held to a higher fiduciary standard than other Providence employees by virtue of her position. But Providence never explains, and Texas law does not clearly command, that her fiduciary status limited her ability to prepare for other employment. And the existence of heightened fiduciary duties alone would not demonstrate Appellees' knowing participation in any breach.

compensation as part of her reasonable preparation to compete. *See Johnson*, 73 S.W.3d at 201–02; *Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 766 (Tex. App.–Houston [1st Dist.] 2017, pet. denied). Fleming's actions, while surely self-serving, fall well short of the extensive disloyalty that Texas courts have held to rise to a breach of fiduciary duty. *See, e.g.*, *Diakiw v. Stites Mgmt., L.L.C.*, 693 S.W.3d 582, 599–601 (Tex. App.–Houston [14th Dist.] 2023, pet. denied) (employees actively solicited customers to their new venture while still employed); *Abetter*, 113 S.W.3d at 511–13 (solicitation of a current employer's client to a competing venture, if proven, would be a breach of fiduciary duty). Accordingly, Appellees were entitled to summary judgment to the extent Providence's claim was based on the knowing participation by Appellees in these activities involving Fleming.

## 2.

In contrast, other acts by Fleming arguably breached her fiduciary duties. While an employee's latitude to prepare to compete with her employer is expansive, it is not unlimited. Fiduciaries are barred, for example, from appropriating a company's trade secrets, soliciting customers while employed, soliciting the departure of other employees while employed, or carrying away confidential information. *Johnson*, 73 S.W.3d at 202; *see also Johnston v. Am. Speedreading Acad., Inc.*, 526 S.W.2d 163, 166 (Tex. App.–Dallas 1975, no writ).

The district court concluded that Tracie Fleming was not entitled to summary judgment on Providence's claim against her for breach of fiduciary duty. Examining the record, the district court concluded that Fleming's divulgence of financial information to Hanks and her negotiation of employment on behalf of her husband could reasonably be considered misuse of confidential information or solicitation of another employee's departure. At the same time, however, the district court held that Providence had not

substantiated that Appellees knowingly participated in any breach—the holding relevant to this appeal.

To guide its analysis, the district court relied on *Crossroads Hospice, Inc. v. FC Compassus, L.L.C.*, 606 S.W.3d 294 (Tex. App.–Houston [1st Dist.] 2020, no pet.), *judgment vacated but not withdrawn*, 2020 WL 3866902 (Tex. App.–Houston [1st Dist.] July 9, 2020). In *Crossroads*, an executive presented plans to a competitor for the competitor's expansion and shared her coworkers' salary information with the aim of hiring them away from her employer. *Id.* at 298. The *Crossroads* court held that this failed to establish that the competing company participated in a fiduciary breach. *Id.* at 304–05. Even if the competitor "knew about [the executive's] actions, and even approved of and benefitted from them, [that did] not constitute" knowing participation in the breach. *Id.* at 305. The court further held that hiring "at-will employees who secretly agreed to compete with their employer and took the necessary steps to do so is not, in and of itself, evidence [of knowing participation]." *Id.* Here, the district court, in granting summary judgment to Appellees, assessed that the "evidence Providence presents is nearly identical to the evidence the *Crossroads* court held insufficient to mount a prima facie claim for knowing participation."

Providence urges that *7X Cattle Co., L.L.C. v. Brandstadt*, No. 22-cv-396, 2025 WL 852624 (E.D. Tex. Feb. 28, 2025), is more apt. In *7X Cattle*, an employee worked simultaneously for two companies as a "double agent," sharing confidential information on a transaction between the firms amid active negotiations. *Id.* at *7–17. Under those circumstances, the competitor was denied summary judgment on a claim of knowing participation in a breach of fiduciary duties. *Id.* at *17. Providence asserts that Fleming committed similar breaches when she shared confidential information, negotiated employment for her husband, and identified other Providence

executives who might join Truly—and further asserts that Appellees knowingly participated in these breaches.

We find *Crossroads* to be more instructive. While Fleming's interactions with Appellees were more extensive than those of the executive and her competitor in *Crossroads*, no record evidence suggests that Appellees requested confidential information from Fleming; she appears to have provided such information without prompting. The fact that Appellees "knew about [Fleming's] actions, and even approved of and benefitted from them," did not amount to knowing participation in the breach. *Crossroads*, 606 S.W.3d at 305. Likewise, while Fleming's negotiations on behalf of her husband and identification of other Providence executives for recruitment might have been a fiduciary breach, Truly's planning to hire employees who had privately agreed to compete with Providence would still fall short of knowing participation in that breach by Appellees. *Id.* The instant case is also easily distinguishable from the authorities Providence cites. Fleming did not stand on both sides of a transaction or interfere with negotiations between Providence and Truly; her dealings were entirely between herself and Appellees. *Cf. 7X Cattle*, 2025 WL 852624, at *7–17. Likewise, in *Caliber Home Loans*, a competitor hosted recruitment meetings led by a fiduciary *during* the fiduciary's employment. 2025 WL 71983, at *14–15. No such active solicitation by Fleming is alleged in this case. Nor is any knowing facilitation by Appellees.

There are other acts that arguably constituted a fiduciary breach, such as Fleming's brief participation in "damage control" as Providence employees began departing for Truly. But as to those, Providence has not alleged the involvement of Appellees at all.

Appellees may have known of and benefited from Tracie Fleming's alleged breaches of fiduciary duty as she shared confidential information and

sought out a position at Truly for her husband. Nevertheless, Providence has failed to substantiate its claim that Appellees "contributed to, induced, or facilitated" any fiduciary breach by Fleming under Texas law as to these activities. *Id.* at \*14; *see also Crossroads*, 606 S.W.3d at 305.

**3.**

Finally, Providence offers other actions by Fleming that took place after Fleming's resignation from Providence as evidence of Appellees' knowing participation in a breach. For example, Providence asserts that Fleming, along with Sheets-Sheffield, began soliciting former clients after joining Truly and that Fleming assisted Appellees in recruiting Providence employees after she submitted her resignation.

Generally, Texas employees, upon resigning, shed their fiduciary duties and may compete directly with their former employer. *See Johnson*, 73 S.W.3d at 200; *Coe v. DNOW, L.P.*, 718 S.W.3d 338, 372 (Tex. App.–Houston [14th Dist.] 2025, pet. denied); *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476 (Tex. App.–El Paso 1975, writ ref'd n.r.e.). Providence does not allege that Fleming was contractually bound to avoid soliciting Providence's customers and employees after her resignation, and thus her actions discussed above do not demonstrate Appellees' knowing participation in a breach of fiduciary duty.

However, Providence asserts that a common-law duty required Fleming to avoid the use of confidential information gained at Providence in her new employment. *See Johnson*, 73 S.W.3d at 202; *Anderson Chem. Co., Inc. v. Green*, 66 S.W.3d 434, 442 (Tex. App.–Amarillo 2001, no pet.); *DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 924 (S.D. Tex. 2019). Providence alleges that, after resigning, Fleming used a list of her husband's coworkers and combined it with her own knowledge of Providence employees to curate offers that would attract those employees to Truly. From the success of

Fleming's efforts to recruit these employees, Providence infers that Fleming must have used Providence's confidential information and that Appellees knowingly participated in this misuse.

Not so. Even if we credit Providence's inference that Fleming used confidential information after her resignation, Providence has not presented any evidence that Appellees "contributed to, induced, or facilitated" such use. *Caliber Home Loans*, 2025 WL 71983, at *14 (quotation omitted). In fact, Truly required Fleming to certify that she would *not* use any confidential information gained at Providence and warned her that she would be fired if she did. Insofar as Fleming may have breached a duty not to use confidential information after resigning from Providence, there is no evidence that Appellees participated in any such breach.

To recap: Providence has not substantiated its allegations that Appellees participated in a fiduciary breach by Tracie Fleming. So Appellees were entitled to summary judgment on Providence's claims grounded on those allegations.

## B.

Providence also contends that Mark Fleming breached his fiduciary duties and that Appellees were not entitled to summary judgment on claims of their knowing participation in those breaches. Providence's argument rests on the evidence that Fleming (1) discussed and visited potential office locations, (2) declined to recommend salary raises to employees under his supervision, and (3) spoke with Johnson County Providence employees after his resignation and facilitated their exit to Truly.

As the district court recognized, it is unclear whether Mark Fleming owed a fiduciary duty to Providence at all. *See D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) ("It is generally true that employees are not fiduciaries of their employers simply by virtue of the employment

13

relationship." (citing *Johnson*, 73 S.W.3d at 202)); *but see Pfeiffer v. Ajamie P.L.L.C.*, 469 F. Supp. 3d 752, 761 (S.D. Tex. 2019) ("Any employee who occupies a position of trust owes fiduciary duties to his employer."). The district court, finding it "at least arguable" that Fleming's position as a Team Leader imparted fiduciary duties, nonetheless concluded that Providence had offered no evidence that Fleming breached any duty.

First, as to Fleming's participation in seeking out new office space, much of the analysis of Tracie Fleming's activities remains relevant. He enjoyed the same right to prepare for competition with Providence while he was still employed. *See Abetter*, 113 S.W.3d at 510 ("There is nothing legally wrong in . . . preparing to compete [with one's employer] before the employment terminates."). His reasonable preparation to work at Truly does not amount to a breach of fiduciary duty.

Providence next theorizes that Fleming withheld salary increases from his employees after their January 2021 performance reviews so that they would be more receptive to an offer from Truly. While Fleming's decision may have been ill-motivated, Providence has not demonstrated that it was contrary to Providence's interests, or that Fleming's actions rose to the high level of fraud, dishonesty, or self-dealing that would normally qualify as a breach of fiduciary duties. *See Lowry v. Tarbox*, 537 S.W.3d 599, 615–16 (Tex. App.–San Antonio 2017, pet. denied) (citing *Sneed v. Webre*, 465 S.W.3d 169, 178 (Tex. 2015)). More to the point, even granting that Fleming's decision constituted a fiduciary breach, Providence offers no evidence that Appellees were involved in Fleming's salary decisions for his Providence team.

Finally, Fleming spoke with his former subordinates to discuss leaving Providence. Providence infers from the brevity of some of Fleming's phone calls with these workers immediately after he resigned that a fact issue remains as to whether he had already begun recruiting those coworkers while

still employed.  Providence also asserts that Fleming had a continuing duty to protect confidential information, and misuse of such information may be inferred from the mass exodus of Johnson County employees to Truly.  On review of the record, though, there is no evidence that Fleming solicited other Providence employees before his resignation or that he used confidential information in recruiting them, as the district court observed. *See Johnson*, 73 S.W.3d at 200; *Coe*, 718 S.W.3d at 372; *Herider Farms*, 519 S.W.2d at 476.  Even affording every reasonable inference, Providence fails to show that Appellees were involved in Fleming's outreach to former coworkers.

Because Providence has failed to substantiate its allegation that Appellees participated in a fiduciary breach by Mark Fleming, Appellees were entitled to summary judgment as to those claims.

## C.

Last, Providence argues that the district court erred in concluding that Kim Sheets-Sheffield did not breach any fiduciary duties, such that the court also erred in granting summary judgment to Appellees on the claim that they participated in Sheets-Sheffield's breaches.  Providence's evidence for this claim is that (1) Sheets-Sheffield shared information about compensation and office equipment needs of Providence workers when discussing employment at Truly; (2) she organized a group interview for Southlake employees to meet with Truly recruiters while she was employed at Providence; (3) she began soliciting Providence clients after her resignation; and (4) she did not recommend salary raises for employees under her supervision at Providence.

First, as with Mark Fleming, it is debatable whether Sheets-Sheffield owed any fiduciary duty to Providence.  *See D'Onofrio*, 888 F.3d at 216; *Pfeiffer*, 469 F. Supp. 3d at 761.  The district court found that her position as Team Leader at the Southlake office made the existence of such a duty "at

least arguable." But the district court concluded that Sheets-Sheffield did not breach any fiduciary duty she had.

After contacting Hanks to discuss employment at Truly, Sheets-Sheffield offered "general" information about compensation and equipment needs for Southlake employees whom she hoped would join her at Truly. Although Sheets-Sheffield provided this information at Hanks's request, their discussion did not exceed the boundaries of lawful preparation to compete, as the district court concluded. *See Abetter*, 113 S.W.3d at 510–11.

Nor may Providence ground its claim on the group interview with Truly recruiters that Sheets-Sheffield organized for Southlake employees. Admittedly, Sheets-Sheffield's organization of the interview comes very close to the line: She planned the interview—a "happy hour" with targeted colleagues—while still employed at Providence with the goal of recruiting her coworkers to Truly. And the happy hour/interview itself, which involved the participation of Truly recruiters, took place on the very day she resigned from Providence. But no record evidence suggests that Sheets-Sheffield solicited other employees to join Truly while she was still employed at Providence, nor that Appellees were involved in any solicitation before Sheets-Sheffield's resignation. *Cf. Caliber Home Loans*, 2025 WL 71983, at *14–15 (fiduciary's participation in a competitor's recruitment event while still employed was a breach of fiduciary duty). After her resignation, of course, no fiduciary duties persisted, freeing Sheets-Sheffield to participate in the event. *See Johnson*, 73 S.W.3d at 200. On the record before us, Sheets-Sheffield's conduct complied with Texas fiduciary law—if only barely.

Providence also points to Sheets-Sheffield's solicitation of former clients, promising the "same team" working at a "new company." But no fiduciary duty prevented Sheets-Sheffield from competing with Providence after her resignation. *See id.* And Providence offers no evidence that Sheets-

Sheffield used confidential information in poaching former employees or customers from Providence.

Finally, as with Mark Fleming, Providence asserts that Sheets-Sheffield declined to recommend raises for the employees under her supervision, easing their recruitment by Truly, and that this decision violated her fiduciary duties. Once more, even if this decision rose to the level of a fiduciary breach, Providence has proffered no evidence that Appellees were involved in any decisions on salaries.

All told, Appellees were entitled to summary judgment on Providence's claim that they participated in a breach of fiduciary duty by Kim Sheets-Sheffield.

## IV.

Providence also appeals the dismissal of two contractual claims against Truly, alleging that (A) Truly breached the companies' NDA by misusing confidential information acquired during negotiations; and (B) Truly breached the companies' NSA by soliciting Providence employees during the agreement's one-year term.

## A.

Truly and Providence signed an NDA in April 2019 when the two companies began their merger talks. The agreement required that Truly "only use Confidential Information to advance or enable the [merger transaction] in a manner agreed upon by the Parties" for two years following the receipt of any confidential information. "Confidential information" is defined in the NDA as any "information, whether electronic, oral or written, that is furnished, released[,] or otherwise made available by one party to the other, whether intentionally or unintentionally, which relates to the Transaction or the Discloser's business affairs[.]" Providence alleges that

Truly used confidential information acquired during negotiations—specifically client lists, branch financial information, and key employees' personal details—to open competing offices in North Texas and to poach employees and customers from Providence.

Unapproved use of confidential information under an NDA constitutes a breach of contract. *See Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*, 617 F. App'x 272, 280–82 (5th Cir. 2015) (per curiam). Under Texas law, a plaintiff alleging breach of contract must establish: (1) the existence of a valid contract; (2) the plaintiff's own performance; (3) a breach of contract by the defendant; and (4) damage to the plaintiff. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 287 (5th Cir. 2017). Only the question of breach is contested in this case. To defeat summary judgment, then, Providence must present some evidence that Truly breached the contract by misusing confidential information provided by Providence. *See Lewis v. Bank of Am. NA*, 343 F.3d 540, 545 (5th Cir. 2003) (citing *Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 353 (Tex. App.–Corpus Christi–Edinburg 2002, pet. denied)); *see also Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex App.–Houston [14th Dist.] 2005, pet. denied)); *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 712 (5th Cir. 1999). The mere potential for breach, or speculation that breach occurred, is insufficient to defeat summary judgment. *See GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 322–24, 326–27 (5th Cir. 2018); *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 484 (5th Cir. 2014), *cert. denied*, 576 U.S. 1004 (2015); *Boudreaux v. Flagstar Bank FSB*, 623 F. App'x 235, 238 (5th Cir. 2015) (per curiam).

The district court, relying on its earlier grant of summary judgment on Providence's trade secrets claims, concluded that Providence had not met its burden. *See Providence Title Co. v. Truly Title, Inc.*, 732 F. Supp. 3d 656 (E.D. Tex. 2024). In its order dismissing the trade secrets claims, the district court

thoroughly assessed the record, finding no evidence of any "actual use" of Providence's customer lists, compensation information, or financial data. *Id.* at 668–72. The district court determined that, at most, any use of confidential information was merely inferable from the circumstances. *Id.* at 668–71; *see also CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 263 (5th Cir. 2022) (per curiam) (holding that evidence of the use of confidential data, inferred only from the success of a defendant's business strategy, was insufficient even to grant a preliminary injunction). As the district court explained, "'[t]he mere fact of [Truly's] ability to compete does not itself suggest that [the company] did so by misappropriating trade secrets.' [T]he fact that a defendant is successful and acquires clients from a plaintiff does not demonstrate that the defendant used the plaintiff's trade secrets." *Providence*, 732 F. Supp. 3d at 669 (quoting *GE Betz*, 885 F.3d at 326).

On appeal, Providence adds little to fortify its arguments. Most of Providence's briefing on this claim repeats the pertinent facts: Before 2019, Truly leadership was unfamiliar with Providence operations in North Texas, and information about the relevant Providence offices was exchanged during acquisition negotiations. Providence urges that subsequent misuse of confidential information may be inferred from two developments, namely, Truly's move to open offices to compete with Providence's profitable locations, and Truly's successful poaching of numerous Providence employees with offers of higher compensation. However, Providence does not ground its assertion on any demonstrated use of confidential information by Truly; it only insists that alternative explanations for Truly's success are not credible.

Providence also contests the relevance of the district court's analysis of Providence's trade secrets claims. As Providence notes, the trade secrets analysis focused only on customer lists, compensation information, and branch financial data, while the NDA's definition of confidential

information is substantially broader. But even granting that the NDA's definitions sweep more broadly, Providence has not offered any record evidence creating a fact issue as to the use of confidential information in breach of the NDA; the evidence shows only *access* to such information, which is not enough to sustain a claim for breach of the NDA.

Providence is also incorrect that the use of confidential information may be reasonably inferred from the circumstances. First, the successful recruiting of Providence employees appears to spring more from the actions of the Flemings and Sheets-Sheffield than any use of confidential information Truly acquired in negotiations. Likewise, Truly's success in attracting customers does not hinge on the use of confidential information, as testimony offered by Providence itself indicates that customers in the title insurance business tend to follow their preferred agents between firms. In sum, no direct evidence establishes Truly's misuse of confidential information; nor could a reasonable factfinder infer misuse from Truly's later success alone.

Providence further asserts that Truly misused the confidential information analyzed in Chris Cranton's consulting recommendations. According to Providence, the "purpose" of the NDA was to prevent the misuse of confidential information, and Truly breached this protective principle by relying on Cranton's analysis, which was derived from confidential information that Providence had shared. It is not clear (and the district court did not decide) whether Cranton's report itself is "confidential information." Regardless, Providence has never demonstrated that Truly relied on the report in taking any disputed action.

Providence conjectures that the decision to target certain employees and offices instead of finalizing the merger was based on Cranton's report. Once more, this theory is speculative at best: The report also identified several profitable Providence offices outside of Southlake and Johnson

County, offices that Truly never targeted.  And the significant disparities between the report's recommendations (including going forward with the acquisition in 2020) and the steps Truly ultimately took indicate that Cranton's report had little effect on Truly's strategy.  Providence presents no evidence to the contrary.

Finally, Providence's characterization that Truly only moved into Johnson County and Southlake because of the confidential information received about Providence's offices is inaccurate.  In the testimony Providence cites, Hanks merely says that Truly was reliant on Tracie Fleming to staff new Truly offices.  But the fact that Truly opted to compete with Providence and relied on Tracie Fleming in its efforts to do so does not demonstrate that Truly misused confidential information in the process.

Distilled down, Providence alleges the breach of the NDA without proffering any evidence of such a breach.  Providence's allegations amount to "unsubstantiated assertions" and speculation, such that summary judgment was appropriate.  *Perez*, 312 F.3d at 194–95.

## B.

Providence also alleges that Truly breached the parties' NSA.  On May 9, 2019, Truly agreed to the NSA at the request of Providence CEO Dan Foster.  At the time, Foster explained that the NSA's purpose was to "let info get stale" before Truly could hire away any Providence employees.  The agreement, executed by exchange of emails, simply reads:  "This email confirms that Truly Title, Inc. hereby agrees to a one-year non-solicitation of Providence Title employees."  "Solicitation" was left undefined, but the district court delineated its meaning under Texas law as "more than merely to ask."  *Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 381 (Tex. App.– Houston [14th Dist.] 2017, no pet.) (quotation omitted).

The parties dispute the NSA's effective date.  In Foster's initial email, he noted the NSA's usefulness "in the event [the two companies] don't get a deal done."  Providence maintains that the one-year non-solicitation period thus began only when negotiations faltered, extending the solicitation bar to November 2020.

In its order denying summary judgment to Truly on this claim, the district court rejected Providence's interpretation of the NSA, noting that "Providence [did] not provide any legal authority establishing that the enforcement date of the [NSA] extended one year from the end of the parties' negotiations[.]"  *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("To be enforceable, a contract must address all of its essential and material terms with a reasonable degree of certainty and definiteness." (cleaned up)).  The district court interpreted the contract as effective from its execution—on May 9, 2019, the date of the email exchange—such that only acts of solicitation prior to May 9, 2020, could constitute a breach.  Still, the district court concluded that a Truly recruiter may have violated the NSA by messaging a Providence employee over LinkedIn as early as September 2019.  On that basis, the district court denied summary judgment to Truly.

The parties agree that any claims for breach of the NSA prior to May 9, 2020, have been waived, as both parties moved for their dismissal to "streamline" this appeal.  *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006).  Providence challenges only the district court's construction of the

No. 25-40194

NSA, which narrowed Providence's non-solicitation claims to those accruing before May 9, 2020.[2]

A district court's interpretation of a contract is reviewed *de novo*. *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511–12 (5th Cir. 2014). When, as here, "summary judgment is sought in a case involving breach of contract, [and] neither party contends that the contract is ambiguous, then the contract's construction is a question of law." *U.S. Risk Ins. Grp., Inc. v. Woods*, 399 S.W.3d 295, 299 (Tex. App.–Dallas 2013, no pet.) (citing *Richardson Lifestyle Ass'n v. Houston*, 853 S.W.2d 796, 800 (Tex. App.–Dallas 1993, pet. denied)). Under Texas law, "the primary consideration" in interpreting contracts "is to give effect to the parties' intent, as expressed in the contractual language." *Northland Indus., Inc. v.*

---

[2] The procedural history of this claim is somewhat tortured. Cutting to the chase, the parties agree that non-solicitation claims accruing before May 9, 2020, remained viable after the district court denied summary judgment to Truly, while claims accruing after that date were held to be outside the scope of the NSA. To "streamline" the case for appeal, Providence moved voluntarily to dismiss the surviving claims and represented to the district court that it would not pursue its non-solicitation claims "as limited by the [district court's] summary judgment orders." Truly then moved unopposed under Federal Rule of Civil Procedure 41(b) to dismiss Providence's NSA claims, and the district court granted this motion. As a result, Truly does not address construction of the agreement, arguing instead that Providence abandoned its non-solicitation claim altogether.

The district court's dismissal order does not denote whether claims accruing after May 9, 2020, were included in its purview, as opposed to the claims that remained viable after denial of summary judgment. But Truly's assertions that "Providence's intent to abandon its claim for breach of the non-solicitation agreement could not [have been] more clear," and that "Providence surrendered the right to appeal" the construction of the NSA are incorrect. Providence made clear in its motions papers that it acquiesced only to dismissal of its NSA claims as narrowed by the district court and that it reserved the right to appeal all adverse decisions subsumed in the final judgment, including the district court's construction of the NSA. In any event, the district court's interpretation of the NSA and subsequent dismissal of the remaining solicitation claims may be affirmed without deciding the precise effect of the district court's orders.

*Kouba*, 620 S.W.3d 411, 415 (Tex. 2020) (internal quotation marks omitted). "Absent absurdity, contracts must be interpreted according to their literal terms." *Id.* For a term to be enforceable, it must be addressed with "a reasonable degree of certainty and definiteness" such that courts may "confirm that both parties actually intended to be contractually bound." *Fischer*, 479 S.W.3d at 237 (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)); *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

Providence asserts that the NSA's clear purpose was to protect information exchanged at any stage of negotiations. As a result, the district court erred in capping the NSA to proscribe only solicitation occurring within a year of the agreement's inception, rather than any solicitation occurring within a year of Truly's receipt of covered information. Providence contends that the district court's construction was "unreasonable, inequitable, and oppressive," *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987), and that the district court should have "avoid[ed] constructions of contract language that would lead to absurd results." *Rosetta Res. Operating, L.P. v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022).

Providence overstates its case. The NSA at issue in this case consists of only a few sentences across two emails. While Foster (and Providence) may have understood its effective period to commence only once negotiations failed, the only term he offered with "a reasonable degree of certainty and definiteness" was the agreement's one-year duration, as the district court observed. *Fischer*, 479 S.W.3d at 237. The district court's determination that the NSA was effective immediately as of May 9, 2019, and terminated a year later, on May 9, 2020, was not "absurd," contrary to Providence's assertion. *See Northland Indus.*, 620 S.W.3d at 415. By May 2019, the parties were already exchanging confidential information, as Foster

acknowledged, and an immediate effective date served the purpose of the agreement by protecting information exchanged even before negotiations soured. Moreover, insofar as any ambiguity remains, Texas law resolves that ambiguity against the contract's drafter—in this case, Providence. *See Gonzales v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990). Providence could have easily made the delayed effective date explicit. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) ("A contract's plain language controls, not what one side or the other alleges they intended to say but did not." (internal quotation marks omitted)). Thus, we "may not and will not rewrite contracts to insert provisions that the parties could have included but did not[.]" *Maxey v. Maxey*, 617 S.W.3d 207, 223 (Tex. App.–Houston [1st Dist.] 2020, no pet.).

The district court did not err in narrowing Providence's viable solicitation claims to those accruing only before May 9, 2020. And any viable claims were later abandoned by Providence in the district court.

## V.

Providence alleges two derivative claims against Appellees: tortious interference with prospective business relationships and civil conspiracy. For either claim to survive summary judgment, Providence would need to show that a genuine issue of material fact remained as to an underlying tort. *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 705 (Tex. 2015) ("[R]ecovery for tortious interference with a prospective business relation requires a plaintiff to prove that the defendant's conduct was independently tortious or wrongful as an element of the cause of action." (internal quotation marks omitted)); *Haynes v. Bryan*, No. 01-20-00685, 2022 WL 2024837, at *4 (Tex. App.–Houston [1st Dist.] June 7, 2022, no pet.) ("There is no independent liability for civil conspiracy, and a plaintiff has no viable conspiracy claim without an underlying tort." (citing *Spencer & Assocs., P.C.*

No. 25-40194

*v. Harper*, 612 S.W.3d 338, 354 (Tex. App.–Houston [1st Dist.] 2019, pet. denied)).

Because the other torts alleged by Providence cannot survive summary judgment, these derivative claims were properly dismissed as well.

\*　　\*　　\*

At bottom, the record in this case discloses some measure of disloyalty, duplicity, and potentially even fiduciary breach by some of the principal players in this soured merger. Nevertheless, Providence has failed to substantiate its allegations that Appellees participated in any fiduciary breach by Providence employees, or that Truly breached the nondisclosure agreement between it and Providence. Summary judgment was therefore appropriate as to Providence's claims based on those allegations.

Likewise, the district court did not err in construing the parties' non-solicitation agreement. And Providence abandoned the non-solicitation claims that remained viable based on the district court's reading of the NSA.

Finally, because the district court properly dismissed the foregoing claims, Providence's remaining derivative claims were properly dismissed.

AFFIRMED.